UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JERI BLANTON,

            Plaintiff,

v.                                              CASE NO. 8:04-CV-1057-T-27MAP

BUNCH AND ASSOCIATES, INC.,

            Defendant.

_____

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Fed. R. Civ. P. 56, Defendant, Bunch and Associates, Inc. ("BA"), moves for summary judgment dismissing all of Plaintiff Jeri Blanton's ("Blanton's") claims as a matter of law. Blanton, a devout Christian, alleges that BA discriminated against her because she is not Baptist by (a) interfering with her duties as a Director of Nursing, (b) failing to promote her to the VP of Nursing position, (c) removing her duties and (d) constructively discharging her in violation of Title VII and the Florida Civil Rights Act. (Pl. Complaint at ¶¶ 34-37) Alternatively, Blanton claims BA retaliated against her for complaining about religious expression at BA. *Id.* ¶¶ 38-41.

## I. SUMMARY OF ARGUMENT

Blanton cannot present any evidence to meet the very high standard that she was constructively discharged. Nor can she rebut BA's overwhelming evidence that it made decisions regarding Blanton in an entirely non-discriminatory fashion. In the face of such overwhelming evidence warranting summary judgment in BA's favor, Blanton will undoubtedly attempt to obscure the undisputed record and her actual claims by acting like this is a hostile

work environment case-which it is not[1] --via the repetition by Blanton of lurid hearsay gossip and alleged employment actions regarding other people about which Blanton did not know and which have no bearing on her claims. While Blanton's "religious conformity" theory is a relatively novel one, it is not without precedent in this Circuit and, in such cases, the employer is entitled to summary judgment where the employer made legitimate, non-discriminatory decisions without regard to the plaintiff's religious beliefs or lack thereof. Here, there is overwhelming record evidence that the decisions regarding Blanton were based on legitimate factors only and Blanton has absolutely no evidence that any decision regarding her (a) was based on religion, religious conformity or its lack, (b) was based on any alleged complaints about "religious practices" or (c) turned her entirely voluntary and long-planned resignation into an illegal constructive discharge. As a result, summary judgment is clearly warranted.

## II.    BLANTON CANNOT MEET THE HIGH STANDARD TO WITHSTAND SUMMARY JUDGMENT ON HER CONSTRUCTIVE DISCHARGE CLAIM

Blanton claims that she "felt compelled to resign her employment after her job duties were significantly cut and she was unable to manage her employees without the entanglement of religious principals," and that this, along with being denied a VP position, "result[ed] in her constructive discharge." (Complaint at ¶ 32, 39). Such claims are woefully inadequate to establish a constructive discharge in this Circuit. The threshold for establishing constructive discharge "is quite high," *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.

---

[1] Notably, Blanton does not plead that she suffered a hostile work environment. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 932 (7th Cir.1996)(claiming discrimination or retaliation based on disparate treatment is not the same as alleging a hostile environment). This is not surprising as Blanton could hardly claim to be subjectively offended by the words "Lord" or "God" or by receiving a "prayer calendar" at her desk, when **Blanton admits that she prayed at work, asked Goodson to put her nurses on a prayer chain, discussed the "Devil," invited co-workers (and nurses) to her house for "fellowship," and in 2002, prepared and voluntarily presented a commitment proclamation wherein she stated, "I commit to maximize my potential and the persons I am responsible for, by being a role model as a Christian, and a leader."** (Pl. at 12-23; 192, 208, 222-225).

- 2 -

2001), *cert. denied*, 122 S.Ct. 1064 (2002), and is not met where a plaintiff's working conditions are merely unpleasant or even hostile (evidence of which is totally lacking here). *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991); *Hipp*, *supra* ("[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment)." Blanton must demonstrate that her working conditions at BA were so intolerable that a reasonable person in her shoes would have felt compelled to resign. *Id.* In evaluating constructive discharge claims, the Eleventh Circuit applies an objective standard and does not consider Blanton's subjective feelings. *Id.*

Here, it is patently obvious that the only thing that caused Blanton to view her job at Bunch as "intolerable" was her own bruised ego after learning that Funk did not intend to consider her for promotion to a newly created VP position like Blanton perceived all of her "peers" in other department to have been.[2] This conclusion is bolstered by the fact that Blanton admits that the day she learned she was not going to be the new VP, she began actively applying for other jobs and then comfortably searched for other jobs while working at Bunch for *7 months,* only quitting after she had another job where she thought she could work less and make the same money. She certainly told anyone who asked that that was why she was quitting.

It is well-settled that failure to receive a promotion cannot establish "intolerability" sufficient to establish a constructive discharge as a matter of law. In *Wardwell v. School Bd. of Palm Beach Co.*, 786 F.2d 1554, 1557 (11th Cir. 1986), the plaintiff claimed her resignation amounted to constructive discharge where she alleged her employer discriminated against her because of her sex in selecting a man for the position of Acting Director of the School Board.

---

[2]  Q  When did you start -- first start looking for other employment other than Bunch?

    A    I would look after the promotions went through for all my peers and they decided to not give me the opportunity to interview or apply for the VP position. (Pl. at 88)

Unlike here, there was evidence that the plaintiff was (1) qualified for the position whereas the man was not, (2) given an inadequate explanation for the adverse decision, and (3) required to take on additional duties after the promotion of the man (due to his inexperience), working from 8:00 a.m. to 6:30 p.m. five (5) days a week. *Id.* at 1557-1558. The Eleventh Circuit concluded:

> [W]e have a definite and firm conviction that discrimination of this nature and working conditions of this nature cannot constitute the intolerable working conditions necessary to prove a constructive discharge. **While [the plaintiff] may have been frustrated by her failure to be appointed Acting Director, and while this may have been a matter of some embarrassment to her, these facts, together with her added workload, simply do not rise to the intolerable level at which a reasonable person would feel compelled to resign.**

*Id.* at 1558 (emphasis added). Likewise, Blanton cannot establish a constructive discharge because she did not like Baltzer's reformulation of her job duties with no change in title (Director) and no reduction in pay. While Blanton may subjectively have believed herself deserving of the VP position (despite the mass of evidence to the contrary, including *three independent* negative audits of her department while she was at its helm) and may have disliked the new tasks Baltzer assigned her (despite getting to do them at Director's pay), such subjective desires are not enough to compel a reasonable person to resign. If, anything, the record shows Blanton was *favored by* BA. Instead of discrimination or retaliation, Blanton rapidly rose through the company hierarchy, receiving raise upon raise along the way. Blanton suffered no change in status, pay or title after her supposed "opposition" to religious practices at BA.[3] To the contrary, Funk told Baltzer himself that Blanton could not be terminated because of her close friendship with Cynde Bunch.

---

[3] Moreover, the only time Blanton supposedly objected to any "religious" conduct was prior to 2001, almost three years before her constructive discharge and two years before the decisions at issue and there is no evidence that Baltzer or any decisionmaker even knew about those discussions let alone punished her for them.

Blanton, nevertheless, testifies that after Baltzer changed her job title from Director of Nursing to Director of Programs for Lowe's, **"I seen it as they were escorting me out the door."** (Pl. at 168) Such unsupported speculation does not convert her voluntary resignation into a legally actionable constructive discharge. See *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974 (11th Cir. 2003)(where the plaintiff heard rumors that his employer planned to fire him in the future because of his race, the Eleventh Circuit affirmed summary judgment, holding that even if the statements of the co-workers were correct, "we decline to reach a holding that would encourage speculative litigation and discourage employees and employers from resolving their differences from within the employment relationship."[4] Accordingly, BA is clearly entitled to summary judgment on Blanton's constructive discharge claim

## III. BLANTON HAS NO EVIDENCE THAT FUNK DID NOT SELECT HER FOR THE VP POSITION OR THAT BALTZER REFORMULATED HER DUTIES BASED ON RELIGION OR LACK OF RELIGIOUS "CONFORMITY"

Even relatively straightforward religious disparate treatment cases, where the plaintiff claims to be discriminated against based on his/her own religion are not abundant in Eleventh Circuit jurisprudence. Here, however, Blanton claims in her Complaint that BA discriminated against her by not promoting her to VP of Nursing at the same time as her "peers" in other departments and by reassigning her duties as a Director because she is "*not Baptist,*" alleging some kind of reverse-religious discrimination. The Eleventh Circuit has never expressly

---

[4] Additionally, Blanton's seven (7) month job search while employed at Bunch and acceptance of another job prior to her voluntary resignation further negates her constructive discharge claim. *See Wagner v. Sanders Assoc., Inc.*, 638 F. Supp. 742, 745-46 (C.D. Cal. 1986) ("a plaintiff wishing to claim that he had no choice but to leave must leave when the choice is posed, not after he has afforded himself the chance to avoid the unpleasant consequences of leaving"). *See also Regis v. Metropolitan Jewish Geriatric Ctr.*, 2000 WL 264336, at *12 (E.D.N.Y. January 11, 2000) ("[a]n employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable"); *Douglas v. Mitzelfield's Inc.*, 8 F.Supp. 2d 650 (E.D. Mich. 1997) (granting summary judgment on constructive discharge claim because, *inter alia*, plaintiff received a job offer from another company prior to her resignation, undercutting her claim that a hostile working environment forced her resignation).

recognized being "not Baptist" as a protected class, nor has the Eleventh Circuit expressly recognized reverse-religion discrimination claims where the plaintiff, like Blanton here, while "not Baptist," *is* Christian, the predominant religion that everyone at Bunch that testifies to actually having a religion *is also*.[5]

    To establish a *prima facie* case for failure to promote, Blanton must prove that: (1) she is a member of a protected class (here, she claims, "not Baptist"); (2) was qualified for and applied for the promotion; (3) she was rejected; (4) other equally or less qualified employees who were not members of the protected class were promoted; and (5) the person who made the decision to impose the adverse employment action upon plaintiff was aware of her religious beliefs. *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301 (11th Cir. 2002).  Blanton's claim **fails as to every element.**  There is no evidence that being Baptist was a requirement for advancement or hire at Bunch.  Indeed, BA's Founder, Owner and Chairman of the Board Cynde Bunch is **not Baptist**.  Blanton's direct supervisor and the key decisionmaker in this case, COO, now CFO, Funk **is not Baptist**, or at least not according to Blanton, and there is no record evidence that he conforms to *any* particular religion.  *See Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033 (10th Cir. 1993)(where court held plaintiff's "assertions that Mormons are clannish and his own assessment of his job performance were inadequate to raise an issue of fact" where, like here, plaintiff admitted he worked under a non-Mormon supervisor and the decision to terminate was made by a non-Mormon).

    **Moreover, there is no evidence that *any* of the individuals considered for the VP of Nursing position at issue (Baltzer, McCormick, Bennett or Keleher) were Baptist or, for**

---

[5] Both CEO Goodson and Bunch describe themselves as "Christians" but they attend different churches and are of different faiths -- Bunch is a Lutheran, Goodson attends a Baptist Church, but also has attended other churches, including Assembly of God. (Goodson at 12, 26-27).  COO/now CFO Funk apparently believes in God, but his religious faith is unknown. (Funk, global, and at 113; Pl.at 35; Bennett at 20-21).

that matter, of any particular religion.[6]  It is undisputed that no one knew if they followed any religion or none.   Indeed, it is undisputed that HR Manager Todd McCullough told the headhunter who recruited Baltzer to look for candidates with national industry experience in nurse disability case management that could take the company to the next level because the company was growing very rapidly.  (Senello Dec.)  Religion was never discussed.  *Id*

Likewise, to the extent Blanton claims that her "peers" promoted to be VPs in other departments are additional appropriate comparators—which they are not—even they are not "outside of her protected class," as two of the four were *not Baptist*.[7]

Likely recognizing the futility of seeking to have a claim based on the "non-Baptist" protected class, Blanton alternatively asserts that she was not promoted and her Director duties changed because (a) either she was already "saved," so no one could "witness to" her or (b) because she refused to "witness to" employees herself as she speculates CEO Lief Goodson was doing:[8]

---

[6] Bennett testifies that during her interview process prior to hire and prior to the offer of the VP of Nursing position, and indeed, during her entire tenure at BA, no one asked her what her religious views were.  (Bennett at 20-21)  In fact, Bennett is not a regular church-goer and she never felt compelled to follow or express a particular religious view at Bunch.  *Id.*  Keleher likewise testifies that during her interview for VP and her entire tenure at BA, no one asked her about her religious views, or to her knowledge, knew what they were or if she had any, and she was never offended by anything she ever saw or experienced at Bunch.  (Pl. at 144; Keleher Dec.)

[7]  In fact, other "peers" of Blanton's were likewise not promoted in October 2002--Director Cecilia Segreto was not promoted by Funk to a VP position in her department, the IT Director was not promoted by Funk to a VP position and instead the company hired a CIO from outside the company, and the Controller was not promoted to a VP of accounting--because Funk did not believe these people were qualified to function at the VP level – "we filled within where we felt we could – we have gone outside where we felt we had to."  (Funk at 128-129)

[8] While CEO Goodson clearly views himself as deep by religious, he has never used Christian terms or "God" or religion to speak to employees about their performance and he does not select employees based on the criteria that they share his religious views.  (Goodson at 61-63, 96, 97, 99-100, 104)  Goodson further testified that BA had "people of non-Christian beliefs" and probably atheist employees as well that had done well at the company and he does not hold an employee's religious beliefs against them. (Goodson at 104)  Goodson was never Blanton's direct supervisor and did not know what religion

Q      I guess what I don't understand is it seems like from what you're describing to me is that you're a Christian?

A      Yes.

Q      And Pentecostal?

A      Yes.

Q      **And is it your belief that you were not given the promotion to the VP of nursing position because you are that religion?**

A      **No.**

Q      Okay.  **Is it your belief that you were not given the director of nursing position because you're not another religion?**

A      **No.**  It's because …I was open about my faith, but I wasn't a -- I didn't come in and try to save people and intimidate people with my religion… .I'm not there to judge people.  God is the one that judges people, not Cynde Bunch, not Lief Goodson or me.

…

Q      …You sort of described to me:  "Well, yeah, we're all Christian, but you either have to be openly Christian or you have to be being witnessed to to get ahead at Bunch."

A      That's right.

Q      Okay.  So I'm asking: Which category is Bruce Kindy in if it's different than how you were?

A      He's saved, so he's okay.

Q      But so are you.

A      But I openly opposed what they were saying, and he didn't.  (Pl at 156-157)

If this claim is something other than retaliation, addressed *infra*, than the claim can only

be analyzed, if actionable at all under the rubric of "religious discrimination," by looking to the

*only* case in this Circuit to address even a remotely similar disparate treatment claim.  In a case

affirmed by the Eleventh Circuit, *Tillary v. ATSI, Inc.*, 242 F.Supp.2d 1051 (N.D. Ala. 2003),

---

Blanton was, but assumed she was Christian because in the few passing conversations they had directly, she mentioned having attended a church conference.  (Goodson 31-32)

*aff'd*, 97 Fed. Appx. 906 (11th 2004), the plaintiff alleged that her former employer subjected her to a religiously hostile work environment, and then terminated her because she did not conform her behavior to her supervisor's religious beliefs. The district court granted summary judgment for the employer on the discriminatory discharge claim.

Although the plaintiff alleged that the founder and owner of the company (who was Catholic), (1) regularly invited plaintiff to attend his church and then when she would not attend, would tell her she was "fucking up;" (2) told plaintiff that she needed to pray; (3) asked plaintiff about her illegitimate children; (4) asked plaintiff if she had her previous marriage annulled, told plaintiff that she needed to get her previous divorce annulled, and unless it was annulled, she would never be able to attend a Catholic church; (5) placed rosary beads on plaintiff's desk and asked her to hand them out and take them home to her kids; (6) told plaintiff that she needed to get herself and her son into church; (7) told plaintiff to pray about her financial difficulties; (8) told plaintiff she was stupid when she told him that she did not know [what] Fatima, Portugal was (in relation to the sightings of the Virgin Mary), (9) told plaintiff on her evaluation that she should keep going to church and all other things would come; and (9) wrote in plaintiff's termination letter that "after great prayer to God and anguish of Heart I have come to the decision that your position here with ATSI, Inc., be terminated, enclosing citations to scripture, and signing it, "Your brother in Christ, "I strongly suggest you talk with God, just take some time by yourself and talk with him, no formal prayers required. If you'd like the Lord's prayer always helps me to open up to our heavenly Father," **the Court held that Plaintiff's termination was, nevertheless, based on undisputed legitimate non-discriminatory reasons that were not a pretext for unlawful motives.**

The court disagreed that the plaintiff had direct evidence of a discriminatory discharge based on the above conduct. The court further explained that the typical disparate treatment *prima facie* case (based on a plaintiff's religious beliefs) was unsatisfactory in a case where the plaintiff alleges she was subjected to an adverse action because she did not share the religious beliefs of her employer, or conform to his proselytization. The court held that, in such instances, the plaintiff "need only show that her perceived religious shortcomings (her unwillingness to strive for salvation as [her employer] understood it, for example) played a motivating factor in her discharge. *Id.* (citing, inter alia, *Shapolia* at 1038).

The court explained that it did not matter which *prima facie* formulation applied because, like here, the plaintiff still did not establish that defendant's stated reasons--that the plaintiff was terminated only after it was discovered that she failed to forward more than 130 invoices to customers totaling in excess of $200,00 owed to the company—was pretextual.

Here, Bunch and Associates has presented overwhelming evidence that it made decisions relative to Blanton based entirely on legitimate, non-discriminatory reasons. *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)(where employer produces evidence of legitimate non-discriminatory reason, plaintiff has burden of showing that such reasons were a pretext for an illegal reason). Blanton has produced **no** evidence that such reasons are a pretext for discrimination. It is undisputed that after Blanton's promotion to the Director of Nursing position at least four of her co-equals reported ongoing concerns regarding Blanton's performance as the high profile Director of Nursing for the Lowe's account, including that she was unprofessional, rude, defensive, had poor verbal and written communication skills, appeared unable to correct deficiencies within her department, and had poor leadership skills. It is undisputed that in November 2001, BA's largest account, Lowe's, threatened to pull its account

after HJH Group, Inc. (at the behest of Lowe's, not Bunch) audited Blanton's department and gave it a very poor review, causing BA's into a tailspin. Blanton herself admitted that she was over her head while Director of Nursing, did not like managing nurses, and that the company's other accounts were also suffering. As a result, Cynde Bunch herself became more involved in attempting to improve the Lowe's program and the company added another Director of Nursing to handle Non-Lowe's accounts, freeing Blanton to attempt to improve her management performance by focusing solely on the all-important Lowe's account. However, in August 2002, (only nine (9) months later), HJH Group, Inc., again audited Blanton's department and again, gave a very poor review advising that Blanton's department was not in compliance with Lowe's guidelines and that the case management services were not effective.

COO Funk described in exquisite detail his reasons for considering Blanton ineligible for consideration for the newly created VP of Nursing position, which were, not only that she lacked the national industry experience the company was looking to add with the new VP of Nursing, but that, in his opinion, she lacked the leadership skills necessary to function optimally in the position she already held. (Funk at 60-70) As the primary decision-maker in the decision not to promote Blanton to the VP of Nursing position in October 2002, Funk determined that Blanton had already been promoted one level beyond her expertise and that, because she had only worked at BA, did not have the industry experience, the ability to bring about new ideas and solutions, or the ability to revamp the nursing department. *Id.* Further, although Blanton had good technical nursing skills, she had not been successful at managing the technical aspects of her position, building a successful management infrastructure, ensuring timely file review and adequate staffing, and was not polished in her written or verbal communications. *Id.* Goodson, to the extent he had views regarding Blanton's performance, echoed such reasons in his deposition. It

is axiomatic that "[personal qualities...factor heavily into employment decisions concerning supervisory or professional positions. Traits such as 'common sense, good judgment, originality, ambition, loyalty, and tact' often must be assessed primarily in a subjective fashion." *Denny v. City of Albany*, 247 F.3d 1172, 1185-86 (11th Cir. 2001) (citations omitted; emphasis added); *See e.g., Raymond v. City of Chicago*, 183 F.Supp.2d 1060, 1074 (N.D. Ill. 2002)(supervisor's decision not to promote female police employee to Captain because (like Blanton here) (1) her skills and expertise were not at the level necessary for promotion at that time; (2) she had not mentored and tutored her subordinates; (3) she did not have the proper demeanor to interact with officers and the command staff; and (4) he did not have sufficient confidence in her leadership abilities to promote her, held to be legitimate-nondiscriminatory reason for non-promotion). **Naturally, the two negative outside audits in a row about Blanton's department's handling of Bunch's largest, oldest and dearest account also played a role.** (Funk at 98).

In this same way, Blanton can hardly show, in the absence of any other evidence of pretext (like here) that her qualifications for VP of Nursing were so far superior to the candidates Funk did consider as to "jump off the page and slap you in the face," as required to establish pretext based on her qualifications alone. *See Denney* at 1187 (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000)). "The relevant inquiry" for the Court "is not to judge which employee was more qualified, but to determine whether any disparity between [plaintiff's] and [the others'] managerial qualifications is so great that a reasonable fact-finder could infer that [the company] did not believe [the others] to be better qualified." *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001).[9] **Here, it is Kay Baltzer's qualifications that jump up**

---

[9] Indeed, Funk rejected Keleher for consideration for the VP of Nursing position because he was not impressed with her in the interview, despite her extensive industry and nursing experience. It is undisputed that in rejecting Keleher, like Blanton, Funk did not consider her religious beliefs because both he and Keleher agree he did not ask about or know what they were.

and slap you in the face, not Blanton's.[10]  **Baltzer had 34 years of nursing experience, with 12 of those years spent in supervision at a national company in the case management disability field, 7 of which where in positions at a Director or Regional Manager level.** (Baltzer Dec.)

Everyone that interviewed Baltzer at BA was impressed with Baltzer, and believed her to be qualified for the new VP of Nursing position.  (Bunch at 202-203; Funk at 90; Goodson at 167-168; Breedlove Dec; Rusher Dec.)  Blanton admits she does not know if Baltzer affiliates with any particular religion or whether she has any religious beliefs, period, as Baltzer never discussed religion.  (Pl. at 158)

In fact, Funk predicted that ultimately the new VP of Nursing would be hindered by trying to manage around Blanton's poor management abilities, a prediction that bore out after he ultimately selected VP of Nursing Kay Baltzer, who removed Blanton's direct nurse supervisory functions and shifted Blanton's focus to quality management improvement of Lowe's programs (with no change in Director title or pay).  Indeed, their opinions of Blanton's management skills were confirmed two months after Kay Baltzer's hire into the VP position when, in March 2003, the results of the *third* audit by a *different auditor expressly requested by Blanton*, confirmed the results of the August 2002 negative assessment of Blanton's department in the previous audit by HJH Group, Inc.  **Blanton admits she cannot dispute Marsh's assessment.**

It is well-settled that a plaintiff cannot establish pretext by "questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a

---

[10] Blanton makes much of her MBA from University of Phoenix, but a plaintiff who "merely touts" her educational background has not established that she is more qualified for promotion than the other candidates.  *See Murungi v. U.S. Dept. of Veterans Affairs*, 136 F. Supp. 2d 154, 162 (W.D. N.Y. 2001)(citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)), *aff'd*, 2001 WL 1182801 (2d Cir. October 5, 2001).  This is certainly true here where the VP of Nursing position did not require a Masters.

reasonable employer," *Combs*, 106 F.3d at 1543 (stating that by doing so, "plaintiff confuse[s] disagreement about the wisdom of an employer's reason with disbelief about the existence of that reason," and holding that while the employer's decision to promote another employee instead of the plaintiff may seem to some to be bad business judgment, and to others to be good business judgment, federal courts do not sit to second guess the business judgment of employers).  Here, there is not only some evidence of the legitimacy of BA's assessments of and decisions regarding Bunch, but overwhelming evidence, entitling BA to summary judgment on Blanton's disparate treatment claims.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 1469-49 (2000)(where Supreme Court held that an employer is entitled to judgment as a matter of law if the record conclusively revealed some other nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred…[as] we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact'").

Indeed, Blanton has no evidence that her direct supervisors and key decision-makers even knew what religion she was, if any, and they are themselves of unknown religions.  It is further undisputed, relative to Blanton's "conformance" theory that neither Funk nor Baltzer ever discussed their own or Blanton's religious views with her or tried to witness to or save anyone or tried to force Blanton to.  It is axiomatic that in a religious discrimination case like this one, binding authority requires that **plaintiff must establish that the person who made the challenged employment decision know plaintiff's religious beliefs.**  *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301 (11th Cir. 2002)(holding that plaintiff could not establish a *prima facie* case because plaintiff could not establish that decisionmaker knew plaintiff's religion) *cert.*

*denied*, 537 U.S. 106 (2003); *see also Tillary*, 242 F.Supp.2d at 1061, *supra*. (recognizing requirement of decision-maker's knowledge of plaintiff's religion as fifth element to *prima facie* religious discrimination case).[11]

Accordingly, summary judgment is clearly warranted on Blanton's promotion and "removal of duties" religious discrimination claims.

## IV.    BLANTON HAS NO RETALIATION CASE

**For the same reasons**, Blanton cannot establish that these decisions were based on her alleged "opposition to religious practices." This Circuit has consistently held that in order for a plaintiff to establish a case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; (3) there was a causal link between her protected activity and the adverse employment action. See *Bass v. Board of County Comm'rs*, 256 F.3d 1095 (11th Cir. 2001).

> **Blanton's Unrelated "Complaints" Two Years Prior to the VP Promotion and Three Years Before Her Job Duties Were Changed By Someone Who Knew Nothing About Her Complaints**

Blanton claims that because she allegedly objected to the "religious practices" at BA, Funk did not consider her for the VP of Nursing position in October 2002 and Baltzer later

---

[11] Of course, one could hardly describe Blanton as a "nonconformist," if the "conformist" view to which she claims BA demanded adherence was a Christian one. The record is devoid of any evidence that Blanton did not conform to the "religious" views expressed at BA and instead Blanton herself testifies that she voluntarily displayed Christian beliefs at work. Like CEO Lief Goodson, Blanton expressed, among other things, that she felt "called by the Lord to be at Bunch." (Bunch at 63) Indeed, had BA attempted to quell such expression, Blanton or Goodson could have brought an accommodation claim. "Where the religious practices of employers and employees conflict, Title VII does not, and could not, require individual employers to abandon their religion. Rather, Title VII attempts to reach a mutual accommodation of the conflicting religious practices. This is consistent with the First Amendment's goal of ensuring religious freedom in a society with many different religions and religious groups. *E.E.O.C. v. Townley Engineering & Mfg.* Co., 859 F.2d 610, 621-622 (9th Cir 1988), *cert. denied*, 489 U.S. 1077 (1989). Indeed, Title VII does not prevent Blanton or Goodson from expressing their religious views at work so long as they do not make employment decisions on the basis of their religion or illegally harass others.

"stripped [her of her] title as Lowe's Director" in 2003. "  (Pl. at 151)  In this regard, Blanton alleges the following "protected activity:

- In approximately 1999-2000,  Blanton, then Bill Review Director Anita Breedlove, and then Claims Director Debbie Livingston complained to then Human Resources Manager Cecelia Segreto about a "prayer calendar" circulated at Bunch by Goodson's wife, the "daily attendance," and about Goodson's wife and young sons and nieces distributing plastic Easter eggs filled with colored jelly beans that represented the different aspects of Jesus.  (Pl. at 34-35; Goodson at 143)   Blanton admits she only took offense to the "prayer calendar" because she wanted to be able to specify what kind of prayers she wanted on her "prayer" day.  (Pl. at 29-30)   Blanton admits that despite this discussion she was not personally offended by any "religious practices" at BA until August or September 2001 and did not consider BA a hostile place to work.  (Pl. at 28)  In fact, in the Spring or Summer 2001, Blanton admits that she even encouraged her own daughter to apply and work at BA.  (Pl. at 25)  Blanton's daughter Tracie worked at BA until the Spring of 2003 when Tracie left to return to school.  (Pl. at 25)

- In August-September 2001, Blanton told Bunch at a lunch together that she was concerned because she felt CEO Goodson and then Director of Quality Assurance Berta Bennett spent too much time together at the office behind closed doors.  (Pl. at 43-53)  Blanton's concern was that CEO Goodson and Bennett were more than friends and were having an affair.  (Pl. at 53)  Blanton admits that Bill Review Director Breedlove also complained to Bunch about her similar perceptions.  (Pl. at 44-45)  Bunch asked Bennett if she was being sexually harassed or in any way made uncomfortable by CEO Goodson and Bennett told her that she was not.  (Bunch at 50-51; Bennett at 42-43)   A month later, when the gossip regarding Bennett and Goodson continued, Bunch called a meeting with Bennett, Goodson, Blanton, Breedlove and Funk and

told them to "resolve the issues." (Pl. at 44-45) Bennett denied that she was being harassed in any way, that she and Goodson were not having an affair, and that they were discussing business (her department). (Pl. at 45-46, 50; Goodson at 109-114; Bennett at 42-43) Goodson also denied that he and Bennett were having an affair. (Pl. at 46-47) When Blanton told Bunch that she still did not believe Bennett, Bunch told Blanton that Goodson was probably "trying to save Bennett," to which Blanton replied that she did not think that was appropriate either because it was behind closed doors; although Blanton herself admits that in the meeting, **Bennett denied Goodson was "witnessing" to her.** (Pl. at 47; Bennett at 62-64)[12] **Moreover, Blanton admits that she never heard Goodson try to "save or witness" Bennett or anyone else, and her speculation about Goodson's conversations with Bennett are purely that**. (Pl. at 51; Funk at 111-112) Bennett disputes Blanton's speculation that she later left the company because of religious or any other kind of harassment by Goodson, and, to the contrary, Bennett testifies that during her entire tenure at BA no one asked her what her religious views were. (Bennett at 20-21) In fact, Bennett is not a regular church-goer and she never felt compelled to follow or express a particular religious view at Bunch. (Bennett at 20-21;32-33, 63-64) Indeed, Blanton admits she had little direct interaction with Goodson until October 2002 and none at all after Kay Baltzer was hired as VP of Nursing in January 2003. (Pl. at 69-70; Goodson at 31-32) Blanton also admits she received two (2) raises, after these alleged complaints. (Pl. at 137-138)

---

[12] This is hardly protected conduct. A plaintiff can still engage in statutorily protected activity when she protests an employer's conduct which is actually lawful, so long as he or she demonstrates a good faith, *objectively* reasonable belief that the employer was engaged in unlawful employment practices, utterly lacking here. *See Harris v. CCA*, 2005 WL 1400253 (11th Cir. June 15, 2005)(granting summary judgment for employer where plaintiff failed to demonstrate reasonable objective belief discrimination existed); *see also Clover v. Total Sys. Serv., Inc*., 176 F.3d 1346,1350-1352 (11th Cir. 1999)(where Court held that plaintiff's sexual harassment complaint about interoffice dealings including frequent visits with no business purpose, calling on personal beepers, and talking in the hall alone between an Assistant VP [Pettis] and a younger female employee [Waters] "missed the mark by a country mile" and "was not an objectively reasonable belief that Waters was sexually harassed.")

- Finally, Blanton alleges that nine (9) days after Baltzer gave her the new job description as Director of Lowe's Quality Initiatives, on May 1, 2003, Blanton complained to HR Manager McCullough that two (2) nurses had told her that Bunch had telephoned them at home and said that nurse Woods-Brock and another nurse Terra Huie had not acted like "godly role models" in a meeting the previous day. (Pl. at 153-154) Blanton admits she did not witness the "godly" role model statement by Bunch and that both of the nurses who told her about the alleged comment are still employed with the company. (Pl. at 164-165)

Here, for the same reasons, shown above, Blanton cannot establish that her non-selection for the VP of Nursing position and change in Director duties was based on a retaliatory motive.[13] Additionally, as to Blanton's retaliation claim:

### Lack of Proximity in Time Precludes a Presumption that Adverse Actions Causally Related and Instead, Inference is to the Contrary

Assuming that Blanton actually could establish that she engaged in legally "protected activity based on such evidence," which cannot, the time frame between Blanton's alleged "protected activity" and the adverse actions at issue is too long for there to be any causal link between the alleged protected activity and her non-selection for promotion or Baltzer's change in her Director duties (or Blanton's resignation for that matter). The "complaint" to Segreto about the Easter jelly beans, prayer calendar and daily thought were in 1999 or early 2000 at the latest, the complaints about Goodson and Bennett were in August or September of 2001, and promotion of Blanton's "peers" did not occur until October 2002, a year later. Blanton's only

---

[13] For retaliation, moreover, the standard to prove pretext is higher than for discrimination, as the mixed-motive analysis does not apply to retaliation cases, and Blanton must show that "but for" her alleged complaints, she would have been selected for the VP of Nursing and remained the Director of Nursing over Lowe's rather than the Director of its programs. *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998), aff'd; 163 F.3d 1356 (5th Cir. 1998); *Alexander v. Fulton Co. Ga.,* 207 F.3d 1303 (11th Cir. 2000)

other "complaint" regards Bunch's alleged comment, unheard by Blanton, to two nurses that they had not acted like "Godly role models" in a meeting, which happened *after* the challenged employment decisions in this case.   *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)(three to four-month lapse between the protected activity and the adverse action insufficient to demonstrate a causal connection—here, the lapse was *two to five years*); *see also Higdon v. Jackson*, 393 F.3d 1211,1220-21 (11th Cir. 2004)(same); *Kent v. City of Homestead*, 2002 WL 732109 (S.D. Fla., March 14, 2002) (extended period between the complaint and adverse employment action belies any causal connection), *aff'd*, 54 Fed. Appx. 691 (11th Cir. 2002).

### Realignment of Director Duties and "Interference with Duties," Disparate Treatment" Are Not Adverse Employment Actions, and, in any Event, Fail for the Same Reasons

To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must  either be an ultimate employment decision or else must meet some threshold level of substantiality.  *See Stavropoulos v. Firestone*, 361 F.3d 610, 616 – 617 (11th Cir. 2004), *cert. denied*, 125 S.Ct.1850 (2005).  A reassignment to a new position with the same salary level, benefits, and without any diminution in opportunity for career advancement is not adverse an employment action.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) (alleged "blow to professional image" in not receiving temporary title not an adverse employment action sufficient to establish retaliation and noting that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Id.*  Indeed, even where supervisory responsibilities change, as here, such action cannot establish an adverse action, let alone the even higher standard for a constructive discharge.  *See Caussade v. Brown,* 924 F. Supp. 693, 698, 701 (D. Md. 1996) *aff'd*, 107 F.3d 865 (4th Cir.

1997)(where plaintiff was the overall Supervisor of the Nursing Home Care Unit and she was first relieved of half of her overall supervisory responsibilities, and then transferred to supervise only two wards, and finally assigned to supervise only a single ward, court, nonetheless, found "no cognizable adverse action" in any of the reassignments).  "[N]ot everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), and not every unkind act amounts to an adverse employment action.  *See Wu v. Thomas*, 996 F. 2d 271, 273 n.3 (11th Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994).

WHEREFORE, Blanton is without any evidence of discrimination or retaliation in this case.  As such, she has failed to fulfill her burden of proof, Bunch requests entry of summary judgment as a matter of law.

Dated:  this 31st day of August, 2005          Respectfully submitted,


By:/s/ Tracey K. Jaensch
    Tracey K. Jaensch
    Florida Bar No. 907057
    Kelly H. Chanfrau
    Florida Bar No. 0560111

    For the Firm
    FORD & HARRISON LLP
    101 E. Kennedy Boulevard, Suite 900
    Tampa, FL  33602-5133
    Telephone:  (813) 261-7800
    Facsimile:  (813) 261-7899

    Amanda Peralta Jarret, Esquire
    Clark, Campbell & Mawhinney, P.A.
    Post Office Box 24627
    Lakeland, FL  33802-4627
    Telephone:  (863) 647-5337
    Facsimile:   (863) 647-5012

    Attorneys for Bunch and Associates, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2005, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

the following:

Catherine A. Kyres
Kyres Law Firm
3818 W. Azeele Street
Tampa, FL 33609


___/s/ Tracey K. Jaensch_____
Attorney

TAMPA:203290.1