UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JERI BLANTON,

          Plaintiff,

vs.                                        Case No. 8:04-CV-1057-T-27MAP

BUNCH AND ASSOCIATES, INC.,

          Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**BEFORE THE COURT** is Defendant's motion for summary judgment (Dkt. 29) and Plaintiff's memorandum in opposition (Dkt. 21). Upon consideration, Defendant's motion is **GRANTED**.

## INTRODUCTION

Plaintiff, Jeri Blanton, initiated this action against Bunch and Associates, Inc. (hereafter Defendant or "B&A") in a two count complaint, alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Florida Civil Rights Act of 1992, § 760.10 *et seq*. ("FCRA"). (Dkt. 1).[1] Plaintiff alleges B&A discriminated against her on the basis of her religion, "which is not Baptist", by interfering with her management duties, failing to promote her, forcing her resignation and retaliating against her for reporting religious activity. *Id*.

---

[1] The legal principles applicable to Title VII claims are equally applicable to claims brought pursuant to the FCRA. *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986).

Reading the allegations of the complaint in the light most favorable to Plaintiff, Plaintiff has pled claims for (1) disparate treatment (interference with work duties and failure to promote), (2) constructive discharge and (3) retaliation. Contrary to Plaintiff's assertion in her response to B&A's motion, Plaintiff has not pled a cause of action for hostile work environment.

## FACTUAL BACKGROUND[2]

B&A "assist[s] employers . . . with medical care and recovery of injured employees by providing . . . Medical Case Management . . . and Medical Bill Reviews . . ." (Funk Aff., ¶ 3). Plaintiff began her employment with B&A in 1998 and was promoted to Director of Nursing in December 1999. (Plaintiff, 127). According to Plaintiff, she is a Pentecostal born again Christian. (Plaintiff, 12-13). Plaintiff claims B&A discriminated against her because she is not Baptist and was not open to "witnessing" or saving others. (Plaintiff, 158).[3]

Throughout the majority of Plaintiff's employment with B&A, Chuck Funk, acting as Chief Operating Officer, was Plaintiff's supervisor. (Plaintiff, 130). According to Plaintiff, she never discussed religion with Funk. (Plaintiff, 135). Leif Goodson, the Chief Executive Officer and President of B&A, was Funk's supervisor. (Funk, 8-11; Goodson, 8-10). Goodson testified that he is Christian and considers himself Baptist "to the extent that the Baptist align themselves with what [he] believe[s] to be the mission and purpose of all believers as defined in the Bible." (Goodson,

---

[2] All evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1280 (11th Cir. 2004).

[3] According to Plaintiff, "[w]itnessing is teaching or telling people the word of God, trying to save people, bringing them to the Lord." (Plaintiff, 19). Plaintiff does not "witness to others, but by being baptized in the holy Spirit, [her] words and [her] actions exhibit that of a Christian." (Plaintiff, 19). Plaintiff testified that no one at B&A asked her about her religion during her interview and she does not attribute any of the promotions she received, including the Director of Nursing position, to being a Christian. (Plaintiff, 118, 129).

12).  Cynde Bunch was the Chairman of the Board and owner of B&A.  According to Bunch, she is a Christian and a "confirmed Lutheran".  (Bunch, 8, 38-39).

As Director of Nursing, Plaintiff was responsible for many accounts, including B&A's largest account, the Lowes account.  (Funk, 52).  According to Funk, Plaintiff struggled as Director of a rapidly growing department.  (Funk, 61-64, 92-93).  Funk testified that while Plaintiff was Director, the file counts were high.  (Funk, 74).  Funk gave Plaintiff an overall score of 8.4 (on a scale of 1 to 10) during her March 20, 2001 evaluation.  (Plaintiff's Ex. K).

In November 2001, a third party administrator initiated an audit of the Lowe's account, which resulted in a poor review.  (Funk Aff., ¶ 6).  Specifically, the auditor found that B&A was not providing effective nurse case management.  *Id.*  As a result of the negative audit, Bunch was afraid B&A might lose the Lowes account.  (Bunch, 155).  Funk, Goodson and Bunch decided to remove all non-Lowe's accounts from Plaintiff to optimize her servicing of the Lowes account.  (Funk, 50; Plaintiff, 133, Bunch, 115).

Plaintiff testified that in April, May and June 2002, she received several emails from Bunch expressing disappointment in the way that the Lowes account was being handled.  (Plaintiff, 179-180).  According to Funk, he observed numerous performance deficiencies on Plaintiff's part.  (Funk, 74).  In August 2002, a second audit of the Lowes account resulted in another negative assessment of Plaintiff's department.  (Funk Aff., ¶ 7; Plaintiff, 69, 173-75).

### **Failure to Promote**

Sometime in October 2002, Funk announced that due to significant growth, B&A was implementing organizational changes which would result in certain Directors being promoted to Vice President of their departments.  (Funk, 45-46; *see also*, Plaintiff's Ex. HH).  According to Funk, he

told Plaintiff he did not believe she was qualified for the position of Vice President of Nursing and that he was looking outside of the company for a candidate to fill the newly created position. (Funk, 59-62; Plaintiff, 174). After learning this, Plaintiff began looking for another job. (Plaintiff, 91-92).

Plaintiff believes she was not promoted to Vice President of Nursing because she spoke out about the religious practices and [she] was not willing to force [her] personal religious beliefs on the nurses at [B&A]." (Plaintiff, 151). Despite the fact that Plaintiff was a born again Christian, she testified that she was not given the promotion because she was not open to being witnessed or saved, and therefore she "did not fit in". Plaintiff testified that it "appeared" that you had to be Baptist to be promoted. (Plaintiff 158).

According to Funk, Plaintiff was not promoted because she lacked "industrial experience, and the ability to bring about new ideas and lead the nursing department." (Funk, 60-61). Funk testified that Plaintiff's experience was "limited within the industry to what she had gained within [B&A]." (Funk, 65). Funk believed Plaintiff was not polished when interacting with clients and had not been successful in developing an infrastructure of team leaders and managers to the degree B&A expected. (Funk, 60-63). According to Funk, "once [Plaintiff] reached the director level position, . . . the role is different and it goes from the technical aspects of the job to managing the technical aspects of the job. . . . and from [his] perspective, that's where she became limited." (Funk, 65). "[I]t was obvious, at least to [Funk], that there was no possibility that she could function at the vice president level, when, in [Funk's] estimation, she wasn't functioning totally at the director level." (Funk, 67).

Initially, Funk offered the Vice President position to Judy McCormick, a candidate from outside of B&A, McCormick declined the position. (Funk Aff., ¶ 8). According to Funk, he did

not know what religion, if any, McCormick practiced. *Id.*[4] Kay Blatzer, who came to B&A through a recruiter, was ultimately hired for the Vice President position in late January 2003. (Funk, 88; Blatzer Aff., ¶ 16). According to Blatzer, she did not discuss religion with the recruiting company or B&A during the selection process. (Blatzer Aff., ¶ 13). As the new Vice President of Nursing, Blatzer became Plaintiff's supervisor. (Plaintiff, 70). Plaintiff testified that she never discussed Blatzer's religion with her and Plaintiff does not know whether Blatzer affiliates with any particular religion. (Plaintiff, 158).

Plaintiff testified that she was more qualified than Blatzer for the Vice President position because she had national account experience in operations and knowledge of B&A's very unique case management program, which according to Plaintiff, was what Lowes wanted. (Plaintiff, 150). However, Plaintiff conceded that she "never had the opportunity to ask [Blatzer] about [Blatzer's resume/qualifications]". (Plaintiff, 150).

Plaintiff received her bachelor's degree in nursing from Florida Southern College and received a master's degree in organizational management from the University of Phoenix in 2000. (Plaintiff's Ex. J; Plaintiff, 71). Plaintiff had approximately twenty-five years of nursing experience and was a certified case manager, a certified disability management specialist, and a qualified rehabilitation provider for the State of Florida. (Plaintiff, 75-76).

Blatzer received her bachelor's degree in nursing from Pennsylvania State University and was

---

[4] In July 2002, Funk and Goodson offered the Vice President of Nursing position to Berta Bennett, who was acting as Director of Nursing of Standard (non-Lowes) Accounts. ( Funk, 126). Bennett declined the promotion and resigned for personal reasons. (Bennett, 27-28). Myra Keleher interviewed for the Vice President position but was offered the Director of Nursing of the non-Lowes account position instead. (Plaintiff, 142-143). Plaintiff testified that she participated in Keleher's interview and that no one spoke to Keleher about religion during the interview process. *Id.*

a certified Insurance Rehabilitation Specialist. (Blazter Aff., Ex. A). She had thirty-four years of nursing experience, with twelve of those years spent in supervision at a national company in the case management disability field. (Blatzer Aff., ¶ 11).

## Re-assignment to Director of Lowes Quality Initiatives

In March 2003, the earlier negative assessments of the Lowes account were confirmed by a third independent audit. (Bunch, 215-129; Funk Aff., ¶ 9). Shortly thereafter, Blatzer removed Plaintiff from direct nurse management of the Lowes program and created the Director of Lowes Quality Initiatives position for Plaintiff. (Funk, 91-94, 96-97).

According to Blatzer, she "designed this position for [Plaintiff] because in [her] early estimation it would capitalize on her technical skills and because [she] thought having her in this position could prove to be extremely valuable for the company and for the client." (Blazter Aff., ¶ 20). Blatzer averred that she "believed . . . certain important tasks such as annual reports were not being completed and this was a way to ensure that reports would be completed and . . .[Plaintiff] could be more accountable." *Id.* According to Funk, B&A decided to remove Plaintiff as the Lowe's managing director of nursing because Plaintiff failed in the "operational management oversight of the nurses." (Funk, 92). "She was very strong in the technical aspect, therefore [B&A] left her at a director level position on the Lowe's program to really utilize and maximize her skills as a technician, and brought in an operating director, at least [B&A] felt, had strong management skills and the ability to address all of the, quote, organizational infrastructure issues that had been there for a long time." (Funk, 92-93).

Plaintiff testified that she was not sure what her new responsibilities were as Director of Lowes Quality Initiatives because no one discussed them with her. (Plaintiff, 165-166). In her

6

affidavit submitted in response to Defendant's motion for summary judgment, Plaintiff avers that the new position "took away all of the personnel responsibilities" and that she was stripped of "16 of 18 job duties [she] had as Director of Nursing". (Plaintiff Aff., p. 16).   Plaintiff viewed the change in position as B&A "escorting [her] out of the door." (Plaintiff, 168).   Despite the reassignment of tasks,  Plaintiff maintained her status as a Director and her compensation was not reduced. (Plaintiff, 166-168).

**Other Allegations of Discrimination Based on Religion**

In addition to the failure to promote Plaintiff and her re-assignment within the Lowes account, Plaintiff claims that the following religiously charged acts constitute harassment and/or discrimination based on her religion.

(1) *Religious Activities*

Sometime in 2000, Plaintiff felt "uncomfortable" when asked by Cynde Bunch to lead a prayer for one of her co-workers who had become upset about a personal issue. (Plaintiff, 190).  According to Plaintiff, she felt "uncomfortable doing that because [she] knew [they] were in the workplace . . . but [she] did it because the owner of the company told [her] to do so." (Plaintiff, 190).   However, Plaintiff voluntarily participated in group prayer "at luncheons" and after "9/11" (Plaintiff, 192).

According to Plaintiff, she was also offended by the routine dissemination of a prayer calender.  Plaintiff described the prayer calendar as "a calendar that's placed in everybody's mailbox or on their desk that has all the people in [B&A].  Their name is on it for a day for [Goodson's] wife for the prayer [ ] and she prays for you." (Plaintiff, 34-35; *see also* Plaintiff's Exs. W, X, Y).

Other religious activities which Plaintiff felt were inappropriate or offensive include the

7

placement of anointing oils in the building during the weekend to ward off evil spirits (Plaintiff, 38),

the placement of plastic Easter eggs on employee's desks on two Easter holidays (Plaintiff, 35), and

playing religious music while callers were on hold, although Plaintiff was not aware of the music

until a customer complained and thereafter B&A ceased playing it.

Sometime in late 2000 or early 2001, Plaintiff had a discussion about these practices with

Cecilia Segreto, the human resources manager. (Plaintiff, 39, 41). Plaintiff testified that Segreto

said "I have already discussed these practices with Chuck [Funk] and Lief [Goodson], and they're

not going to change." (Plaintiff, 39).

(2)   *Witnesssing*

Plaintiff was offended because Leif Goodson and Berta Bennett were spending several hours

behind closed doors talking about religion. (Plaintiff, 48).[5] According to Plaintiff, Bunch told her

that Goodson said that "the reason that he was spending so much time with Berta is that he was

witnessing to her and trying to save her and bring her to the Lord; that that was his responsibility at

[B&A], that he was led by God to be at [B&A]." (Plaintiff, 47). Plaintiff testified that she never

saw Berta Bennett being saved or "witnessed" by Goodson, but she was offended by "somebody

being witnessed to at work." (Plaintiff, 49, 51).

Plaintiff testified that Stacy Wilson told her that Goodson had been "witnessing to her and

that he wanted her to have the bible and that he had invited her to a women's Christian meeting at

his church that was one day a week . . . and that she wanted permission to go to that meeting, and

. . . she was going to punch out, but it was at the time that she was supposed to be working. And Lief

---

[5] When B&A decided to remove the non-Lowes accounts from Plaintiff, Berta Bennett was promoted to Director of Nursing of Standard Accounts to handle those accounts. (Plaintiff, 133; Bennett, 79).

allowed her to do that." (Plaintiff, 65).

Plaintiff did not tell Cynde Bunch or anyone that Goodson was witnessing Wilson because "[Bunch] is the owner of the company, and [she] didn't want to put her job in jeopardy.  And a lot of people felt they knew, because [Bunch] was so outspoken about her religion and about her witnessing and about being saved, that anything to do with that, people were worried that if anything was brought up that they would not have a job." (Plaintiff, 66-67).  According to Plaintiff, she continued to complain about the conduct but was told that Chuck Funk could not do anything about it because Goodson was his superior.  (Plaintiff, 52).

(3)    *Company Mission, Method and Values Statement*

In June or July 2002, Goodson issued a personal Commitment Proclamation and a Company Mission, Method and Values statement. (Plaintiff's Ex. N).   In his personal Commitment Proclamation, Goodson stated "that the ability and opportunity to work are gifts from God . . ." (Plaintiff's Ex. O). Plaintiff was required to communicate B&A's Mission, Method and Values to the employees she supervised.

Plaintiff testified that she was not personally offended by the reference to God but felt that it was "inappropriate for the whole company, because not everybody . . . is a Christian." (Plaintiff, 208).   After Goodson made his presentation of the mission statement, "Berta [Bennett]  made the comment: 'Do we have to believe these values?  And [Goodson] said, 'you don't have to believe them, but you need to support them.  And if you can't support them, then you need to — there's no reason to be working here.'"   (Plaintiff, 136).

Plaintiff was required by  Goodson to prepare her own set of professional goals.  In relevant part, Plaintiff's goals provided:  "I commit to maximize my potential and the persons that I am

responsible for, by being a role model as a Christian and a leader." (Plaintiff, 222; *see also*, Plaintiff's Ex. EE). According to Plaintiff, stating that you are a Christian in a work document is not inappropriate, but saying you are a "Christian holy roller saved" is inappropriate. (Plaintiff, 224).

Plaintiff asked Todd McCullough, a human resource manager, whether Goodson had obtained human resources' approval of the mission statement before presenting it. McCullough said Goodson did not care because he believed it was a private company and that he could do whatever he wanted to do. (Plaintiff, 215).

(4)   *Email from Bunch dated December 24, 2002*

Cynde Bunch sent an office-wide email titled "The Greatest Gift"on December 24, 2002. (Plaintiff's Ex. Z). Within the email, Bunch asked whether there "is anyone who wants to receive Jesus Christ in their life and does not know how . . . " The email included a Christmas story referencing Mary, Joseph, their travel to Bethlehem, and the birth of Christ. Plaintiff testified that she felt the email was inappropriate because not everyone at B&A was Christian. [6]

(5)   *Bunch's Comment to Plaintiff's Employees*

In May 2003, Plaintiff reported to Todd McCullough that Bunch told two of the nurses working on the Lowes account, Tara Huie and Jennifer Woods, that they were not godly role models. According to Plaintiff, Bunch's comment upset the women and Plaintiff was offended that Bunch would say that to them. (Plaintiff, 165). Plaintiff testified that no one directed religious comments

---

[6] In her response to Defendant's motion for summary judgment, Plaintiff submitted emails dated March, April, May and July 2004 which were sent from the "Receptionist" to "Everyone" and contained "Thought[s] for thinking", such as "God will give us the victory but we must be willing to fight", "We have come upon the most blessed weekend of the year. . . . Let us give honor to the One and Only 'Risen Savior'." (Plaintiff's Exs. P, Q, R, S, T, U, V). These emails are irrelevant to Plaintiff's claims, however, as they were sent after Plaintiff's resignation in 2003.

toward her personally.  (Plaintiff, 243).

(6) *Favoritism and Bunch's Interference with the Performance of Plaintiff's Job*

Plaintiff alleges that Goodson and Bunch's religious activities impacted her ability to manage her employees because they favored employees who were being witnessed.  According to Plaintiff, she wanted to terminate an employee named Raquel who, according to Plaintiff, was frequently late and had an absentee problem.  Plaintiff testified that after she reported the problem, Bunch decided she did not want to terminate her and permitted her to come in later "because Raquel was Catholic, but [Bunch] felt like she was led to be at [B&A] also and that she wanted to protect her and keep her in the fold, as she put it."  (Plaintiff, 200-201).

According to Plaintiff, one of Bunch's personal friends, Robin Hartman, "created havoc on the Lowes account", but when Plaintiff complained, she was called into Goodson's office and was told that Bunch told Goodson that Plaintiff was "to treat [Hartman] like she was the owner of the company; that she could do anything she wanted anytime she wanted."  (Plaintiff, 202).  Plaintiff testified that later Bunch told her that she was trying to "witness" Hartman.  *Id.*

Although disputed by Blatzer, Plaintiff testified that she complained about some of B&A's religious practices to Blatzer.  According to Plaintiff, Blatzer was surprised by some of the activity and told Plaintiff that she "had been given blanket authority to do what she needed to do to change that from Chuck [Funk] and that she didn't see that as an obstacle."  (Plaintiff, 159-160).

## Plaintiff's Resignation - Allegations of Constructive Discharge

In April 2003, Plaintiff accepted a position with another company and resigned from B&A. (Plaintiff, 110-111; Plaintiff Aff., p. 17).  According to Plaintiff, she began looking for another job in October 2002 "after the promotions went through for all [her] peers and they decided to not give

11

[her] the opportunity to interview or apply for the VP position." (Plaintiff, 88). She also testified that she left B&A because "it got to the point where [she] couldn't even manage [her] people because Cynde [Bunch] would come behind [her] and use religious epithets to – the people that were religious, she used that love of Jesus, the love of God and call it, you know, the sins as a way to manipulate people." (Plaintiff, 154).

On her exit interview form, dated June 16, 2003, Plaintiff reported that her resignation was "voluntary - other employment". (Plaintiff's Ex. MM). She listed several recommended changes, which include:

> Unhappy with how changes were handled – the coming [of] VP of Nursing: never got to meet or interview/ask questions, was told after the job was offered and accepted by outside candidate.

> Even if position was offered, wouldn't take it – happy w/Lowe's account, people/relationships, pride and ownership in progression of account.

(Plaintiff's Ex. MM).[7]

## APPLICABLE STANDARDS

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004) (internal citations omitted). "An issue of fact is

---

[7] According to Funk and Blatzer, Plaintiff told them that she was "leaving because she had an opportunity to work a four or three-and-a-half day workweek for a lot more money, and she could spend more time with her mom . . . and her son." (Funk, 124; *see also* Blatzer Aff., ¶ 23).

'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Nolen v. Boca Raton Community Hospital, Inc.*, 373 F.3d 1151, 1154 (11ᵗʰ Cir. 2004).

## DISCUSSION

### I.   HOSTILE WORK ENVIRONMENT

Defendant correctly argues that Plaintiff did not plead a hostile work environment claim in her complaint.[8]   In the context of a discrimination claim, while a plaintiff need not plead a *prima facie* case in order to state a claim, the pleading must meet Rule 8's basic notice requirements. *See Swierkiewicz v. Sorema N.A.*, 122 S.Ct. 992, 997-98 (2002) ("[t]he *prima facie* case . . . is an evidentiary standard, not a pleading requirement"). *Swierkiewicz*, however, "does not vacate a minimal pleading standard for discrimination complaints. The requirement in Rule 8 for a 'short

---

[8] To establish a *prima facie* case of hostile work environment, Plaintiff must establish that (1) she is a member of a protected group, (2) she has been subjected to unwelcome harassment, (3) the harassment was based on her religion, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment, and (5) a basis for holding her employer liable. *See Tillery v. Asti, Inc.,* 247 F.Supp.2d 1051, 1062-63 (N.D. Ala. 2003); *see also Jones v. United Space Alliance, L.L.C.*, 2005 WL 102029 *4 (M.D. Fla. 2005) (holding test applicable to hostile work environment claims based on other prohibited characteristics (*e.g.*, sex or race) is equally applicable to the assessment of a religiously-hostile work environment claim).

and plain statement of the claim showing that the pleader is entitled to relief' means that the specified allegations of fact or law must provide fair notice to the defendant of the nature of the plaintiff's claim and its factual underpinnings." *See Thomas v. Alabama State Depart. of Mental Health and Mental Retardation*, 2005 WL 1389875 (M.D. Ala. 2005) (citing *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993)). While it is true that "notice pleading" is an integral part of the federal rules governing pleading, "something more than [a] conclusory allegation of systematic racial discrimination is required." *See Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1568-69 (11th Cir. 1987) (citing *Ogletree v. McNamara*, 449 F.2d 93, 98-99 (6th Cir. 1971)).

Here, Plaintiff set forth her discrimination claims in two distinct counts. (Dkt. 1). In Count I, entitled "Disparate Treatment Based on Religion", Plaintiff alleges she "was subjected to disparate treatment on the basis of her religion, which is not Baptist" because of B&A's "interference with the performance of her management duties" and failure to promote her to a Vice President position. (Dkt. 1, p. 8). In Count II, entitled "Retaliation", Plaintiff alleges that in "retaliation for [Plaintiff's] protected opposition to religious discrimination and a growing hostile work environment, [B&A] denied [Plaintiff] a Vice President position and took away significant job duties, resulting in her constructive discharge." (Dkt. 1, p. 9).

Despite the reference to a "growing hostile work environment", the essence of Plaintiff's claim in Count II is that she was retaliated against because she opposed ongoing religious activities, as opposed to a claim that she was subjected to a hostile work environment. She does not include any allegations of severe or pervasive harassment based on her religion. Even under Rule 8's liberal pleading standards, Plaintiff's vague reference to a "growing hostile work environment" in the context of her fairly specific retaliation claim falls short of providing Defendant with fair notice that

14

she seeks recovery based on a hostile work environment. Simply put, the complaint does not set forth any factual underpinnings of a hostile work environment claim and does not put Defendant on fair notice of a hostile work environment claim.[9]

Viewing the allegations of the complaint in the light most favorable to Plaintiff, she alleges claims for disparate treatment (interference with work duties and failure to promote), constructive discharge, and retaliation. (Dkt. 1). Plaintiff did not plead a hostile work environment claim in her complaint and may not raise this claim for the first time in response to Defendant's motion for summary judgment. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) (claims not raised in complaint cannot be raised for the first time in plaintiff's response to defendant's motion for summary judgment). Accordingly, a hostile work environment claim is not before this Court.[10]

## II.   DISPARATE TREATMENT

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . .

---

[9] *See Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1270-71 (11th Cir. 2004) (the Supreme Court in *Swierkiewicz* "did not even remotely suggest that a pleading could survive dismissal when it consisted of only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based . . ."); *see also Thomas*, 2005 WL 1389875 at *6 (plaintiff's "vague references" to "negative treatment, harassment and annoyance" were insufficient to allege a retaliation claim); *McKenzie v. E.A.P. Management Corp.*, 1998 WL 657524, 11 Fla. L. Weekly Fed. D 832 (S.D. Fla. 1998) (dismissing plaintiff's complaint for including multiple discrimination claims in a single count; recognizing the ill effects of "shotgun" pleading "in employment discrimination actions."). Plaintiff's complaint cannot fairly be characterized as a "shotgun" complaint, given the specificity with which the allegations are made in the two distinct theories of discrimination. That specificity belies any intent to plead a theory of hostile work environment.

[10] This Court recognizes that Plaintiff alleged in her EEOC Charge that she was "subjected to a hostile environment." (Plaintiff's Ex. NN). This fact, however, does not remedy her failure to plead the cause of action in her complaint. *See Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1570 (11th Cir. 1987) (the fact that plaintiff's EEOC Charge included discrimination claim because the claim was "like or related" to the allegations contained in the EEOC Charge did not remedy plaintiff's failure to plead the claim in the complaint).

to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . ." 42 U.S.C. § 2000e-2(a)(1). The term religion is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious . . . practice without undue hardship . . ." 42 U.S.C. § 2000e(j). In most cases, claims of religious discrimination center around a plaintiff's allegation that her employer failed to accommodate a religious observance or practice. Here, however, Plaintiff alleges she suffered disparate treatment, *i.e.* she was not treated as favorably, because she is not Baptist and was not open to "witnessing" or saving others. (Dkt. 1).

"Disparate treatment" occurs when an employee is treated less favorably simply because of her protected characteristic. *See International Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n.15 (1977). To be successful on this type of claim, "proof of discriminatory motive is critical." *Id.* As Plaintiff has not offered any direct evidence of discriminatory motive, the *McDonnell Douglas* burden shifting framework is applicable. *See McDonnell Douglas Corp., v. Green*, 411 U.S. 792 (1973); *see also, Tillery,* 242 F.Supp.2d at 1058-59 (applying *McDonnell Douglas* burden shifting framework to plaintiff's discriminatory discharge and hostile work environment claims based on religion).

Pursuant to the *McDonnell Douglas* framework, a plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Id.* If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate some legitimate non-discriminatory reason for the employment action. *Id.* Should the defendant carry its burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the

legitimate, nondiscriminatory reasons offered by the defendant were not its true reasons, but rather were a pretext for discrimination. *Id.*

When a plaintiff alleges that she was subjected to disparate treatment because of her religious beliefs, she must establish the following *prima facie* elements: (1) she was a member of/or practiced a particular religion; (2) she was qualified to perform her job; (3) she was subjected to an adverse employment action; and (4) defendant treated similarly situated employees outside of plaintiff's class more favorably. *See Tillery*, 242 F.Supp.2d at 1060 (citing *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d at 1301, 1305-06 (11th Cir. 2002)).

In *Tillery*, the court noted that where a plaintiff alleges that she was discriminated against because she did not share the religious beliefs of her employer or conform her behavior to his proselytization, a plaintiff "need only show that her perceived religious shortcomings (her unwillingness to strive for salvation as [her supervisor] understood it, [ ]) played a motivating role in her discharge." *Id.* (quoting *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997)).[11]   In essence, the court in *Tillery* suggests that if a plaintiff alleges that she was discriminated against because of her unwillingness to heed her supervisor's proselytization, the plaintiff need not demonstrate that similarly situated employees were treated more favorable. Rather, she can establish a *prima facie* case by showing that her perceived religious shortcomings played a motivating role

---

[11] *Tillery* was affirmed without opinion by the Eleventh Circuit. *See Tillery v. Atsi, Inc.*, 97 Fed. Appx. 906 (Table) (11th Cir. 2004)(unpublished).

17

in her discharge. *Id.*[12]

Here, Plaintiff claims she was subjected to disparate treatment because she is "not Baptist" and was not open to saving others. Plaintiff's allegations are distinguishable from the plaintiff's claims in *Tillery* because unlike the plaintiff in *Tillery*, Plaintiff does not claim that her supervisors were trying to save her. Plaintiff testified that no one directed derogatory remarks toward her or tried to "witness" her.[13] Thus, it is questionable whether *Tillery's* modified *prima facie* case should apply to Plaintiff's claim. Nonetheless, this Court finds that Plaintiff fails to demonstrate a *prima facie* case of disparate treatment under either standard.

---

[12] *See also Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1038 (10th Cir. 1993) (holding that "in order to establish a *prima facie* case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors . . . the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs) (emphasis added).

[13] In contrast to Plaintiff's allegation that her supervisors were trying to witness or save other employees, in *Tillery*, the plaintiff's supervisor "repeatedly subjected plaintiff to lectures about her prospects for salvation during working hours, made highly personal inquiries into her private life (*e.g.* the legitimacy of her children, and whether a prior marriage had been terminated by divorce versus the doctrine of annulment sanctioned by the Catholic Church), and 'strongly suggest[ed] [she] talk with God." *See Tillery*, 242 F.Supp.2d at 1064 (emphasis added). Similarly, in *Venters*, the plaintiff's supervisor attempted to "save" the plaintiff, by telling her that "to be a good employee, a person had to be . . . saved", that the plaintiff might be running out of chances to be saved, that their place of employment was "God's house" and if plaintiff were unwilling to play by God's rules, the supervisor would "trade" her. *Venters*, 123 F.3d at 962-63. The supervisor also provided plaintiff with a bible and criticized her personal choices, asserting that she was a bad moral example. *Id.* In *Venters*, the court found that plaintiff presented "a work environment dominated by a supervisor bent on reforming her religious life, who repeatedly threatened her with discharge if she did not play by "God's rules" . . ." *Id.* at 976 (emphasis added). The court further found that the supervisor's remarks as to "[the plaintiff's] need to "save" herself if she wished to remain in the employ of the police department", constituted direct evidence of discrimination based on religion. *Id.* at 976 (emphasis added).

### Interference with Plaintiff's Job Performance

While Plaintiff testified that B&A's practices interfered with her ability to perform her job, she testified to only three incidents: (1) Bunch accusing two of the nurses on the Lowes account as not being godly role models; (2) Bunch deciding not to terminate one of Plaintiff's employees who Plaintiff perceived as having an attendance problem, and (3) Bunch's directive that Plaintiff treat an employee nicely that Plaintiff perceived as "creating havoc" on the Lowes account.

At the outset, it is questionable whether Plaintiff's perceived favoritism or interference was related to Plaintiff's membership in a protected class. Plaintiff's testimony in this regard is based on speculation or indirect evidence that the individuals who received special treatment were Baptist or open to being saved. According to Plaintiff, Bunch said Raquel (the employee Plaintiff believed had an attendance problem) was Catholic (not Baptist) and Hartman (the employee Plaintiff believe "created havoc" on the Lowes account) was one of Bunch's personal friends. Favoritism that is not related to a plaintiff's membership in a protected class is not evidence of discrimination. *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.23d 902, 905 (11th Cir. 1990) (favoritism toward a relative is not discrimination based on sex; "[t]o hold that favoritism toward friends and relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law"); *Aramuru v. Boeing Co.*, 112 F.3d 1398, 1406 (10th Cir. 1997) (animus or favoritism by supervisor that is not shown to be related to plaintiff's membership in protected class is not evidence of discrimination).

Nonetheless, Plaintiff's allegations of interference do not amount to an adverse employment action. While possibly disruptive, Bunch's comment to the two nurses, which was not directed to Plaintiff, did not impact Plaintiff's ability to perform the essential functions of her job. While

19

Plaintiff describes the incident as "religiously charged", she fails to explain how the comment impacted her ability to manage the nurses. Similarly, Bunch's favoritism with regard to two of Plaintiff's employees falls short of demonstrating that Plaintiff's compensation, terms, conditions or privileges of employment were impacted.[14] *See Stavropoulos v. Firestone*, 361 F.3d at 617-18 (employer's decisions that fall short of an ultimate employment action must meet "the requisite level of substantiality"); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) (Title VII is not designed to make federal courts "sit as a super personnel department that reexamines an entity's business decisions").

Even if Bunch's conduct interfered with Plaintiff's ability to perform her job, Plaintiff fails to demonstrate that B&A treated other Directors more favorably because they were Baptist or open to witnessing others. Although Goodson and Bunch's acts may have been offensive and inappropriate, the evidence does not support a finding that they were deliberately favoring certain employees as a way of preventing Plaintiff from performing her job because Plaintiff was not Baptist or open to witnessing others. In the alternative (under the modified *prima facie* case announced in *Tillery)*, the evidence simply does not support a finding that Plaintiff's perceived shortcomings (her refusal to impute her Christianity into the workplace to the same degree as Goodson and Bunch) played a motivating role in B&A's treatment of Plaintiff or her employees. Accordingly, as to Plaintiff's claim that she suffered disparate treatment because B&A interfered with her job performance, Defendant's motion for summary judgment is granted.

---

[14] Notably, Plaintiff only requested that one of the employees be terminated. While she testified that Hartman "created havoc" on the Lowes account, she does not claim that Bunch prevented her from terminating her, only that Bunch directed her to treat her nicely.

## Failure to Promote

To establish a *prima facie* case for discriminatory failure to promote, Plaintiff must prove that (1) she is a member of a protected class; (2) she was qualified for and applied for the promotion; (3) she was rejected; (4) other equally or less qualified employees who were not members of her protected class were promoted; and (5) the person who made the decision to impose the adverse employment action upon plaintiff was aware of her religious beliefs. *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301 (11th Cir. 2002).

Assuming Plaintiff is a member of a protected class and was qualified for the Vice President of Nursing position, Plaintiff fails to present evidence that an equally or less qualified employee who was not a member of her protected class was promoted to the position of Vice President of Nursing.[15] According to Defendant, Funk was unaware of the religious affiliations of McCormick, Keheler or Blatzer's, if any. More importantly and fatal to her claim, Plaintiff fails to demonstrate that Blatzer, the individual selected for the position, was Baptist or open to being saved or witnessed. Plaintiff testified that Blatzer never discussed religion with her and she does not know if Blatzer affiliates with any particular religion. Plaintiff does not dispute Blatzer's averment that religion was never discussed with the recruiting company or B&A during the selection process. The evidence simply does not support a finding that B&A's decision not to promote Plaintiff was discriminatory. Accordingly, Defendant's motion for summary judgment on Plaintiff's failure to promote claim is granted.

---

[15] Plaintiff's claim that co-workers in other departments were promoted to Vice President positions is irrelevant, as Plaintiff does not demonstrate that she applied for any other promotion or that she was qualified for any other Vice President position. Moreover, the evidence establishes that her co-workers who were promoted, Anita Breedlove and Kathy Rusher, were not Baptist. *(*Breedlove Aff., ¶3; Rusher Aff., ¶ 3).

## III.    <u>CONSTRUCTIVE DISCHARGE</u>

Title VII provides, among other things, that an employer may not "discharge any individual because of such individual's . . . religion . . ." 42 U.S.C. § 2000e-2(a)(1).   Where an employer "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation", a plaintiff may bring a claim for "constructive discharge" in violation of Title VII.  *See Doe v. Dekalb Co. Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998); Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997).

In order to recover under a constructive discharge theory, Plaintiff must demonstrate that her employer imposed working conditions that are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." *Poole*, 129 F.3d at 553.   When determining whether an employee's working conditions were intolerable, an objective standard is applied. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citations omitted).

Viewing Plaintiff's testimony in the most favorable light to her, Plaintiff claims that the following conditions amounted to her constructive discharge: (1) Plaintiff was subjected to various religious activities and messages (such as prayer calendars, anointing oils, Easter eggs, "witnessing" of other employees, religious music, a Christmas Eve e-mail from Bunch and the reference to God in the company's Mission, Method and Values Statement), (2) other employees were favored because they were being witnessed or saved by Goodson or Bunch; (3) Plaintiff was not offered the Vice President of Nursing position, and (4) Plaintiff was re-assigned positions within the Lowes account.

22

While Plaintiff may have subjectively perceived B&A's practices as inappropriate, unfair or offensive, in light of the record evidence, a reasonable employee in Plaintiff's position would not have felt compelled to resign.

<u>Religious Activities</u>

Title VII makes it unlawful for an employer to discriminate against any individual employee <u>because of the employee's religion</u>. *See* 42 U.S.C. § 2000e-2. Plaintiff testified that she is a Pentecostal born again Christian. According to Plaintiff, no one directed disparaging religious comments to her. Neither did anyone try to save her, witness her, or convert her. The evidence does not demonstrate that the religious activities or messages were directed toward Plaintiff because she is a Pentecostal born again Christian or because she is not Baptist. For this reason alone, the religious activity Plaintiff contends caused her constructive discharge falls outside the purview of Title VII's protection, as it was either not directed toward Plaintiff or was not based on Plaintiff's protected characteristic. *See Vitug v. Multistate Tax Commission*, 88 F.3d 506, 517 (7th Cir. 1996) (granting summary judgment in favor of employer on plaintiff's constructive discharge claim where no one made disparaging remarks concerning plaintiff's religion and plaintiff failed to prove hostile treatment was a result of plaintiff's religion).

Nonetheless, even assuming that Plaintiff is a member of a protected class because she is not "as Christian" as her superiors, or because she was not Baptist and open to saving and witnessing others, Plaintiff's working conditions were not intolerable. Plaintiff testified that she did not see anyone being witnessed but merely heard about it through co-workers. Likewise, the anointing oils were placed in the building on the weekend, presumably while Plaintiff was not working. Plaintiff testified that she was not aware of the religious music played over the telephone until a customer

complained and then B&A changed the music. Plaintiff testified that she merely felt "uncomfortable" when asked to lead a prayer for a troubled co-worker and felt Bunch's religious email on Christmas Eve was inappropriate because other employees were not Christian.   Similarly, with regard to Goodson's references to God in the Mission, Method and Values statement, Plaintiff testified that she was not personally offended but felt that it was "inappropriate for the whole company, because not everybody . . . is a Christian."

Given the fact that the religious activities did not adversely impact Plaintiff, a reasonable person in Plaintiff's position would not have felt compelled to resign. *See Fitz v. Pugmire Lincoln-Mercury, Inc.,* 348 F.3d 974, 977 (11th Cir. 2003) ("[a] withdrawn reprimand, which has yielded no adverse consequences [upon plaintiff] is not a 'working condition' at all" and therefore, does not amount to an intolerable working condition); *Hipp,* 252 F.3d at 1231 (granting summary judgment on plaintiff's ADEA constructive discharge claim; holding employees are not guaranteed a working environment free of stress); *see also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (unpleasant working conditions are not so intolerable as to compel a reasonable person to resign).

Moreover, Plaintiff testified that she voluntarily participated in at least some of the religious activities, as she prayed during some luncheons and after 9/11.  Although to a lessor degree than Goodson and Bunch, Plaintiff also voluntarily imputed her Christianity into the management of her employees.  In Plaintiff's professional goals, she committed to "maximize [her] potential and the persons that [she is] responsible for, by being a role model as a Christian . . .." Plaintiff testified that stating that you are a Christian in a work document is not inappropriate, but saying you are a "Christian holy roller saved" is inappropriate. For purposes of Plaintiff's constructive discharge claim, the court fails to appreciate any such distinction. It was merely the degree of Christianity

24

demonstrated by Goodson and Bunch that Plaintiff felt was inappropriate. Although distracting and perhaps inappropriate, this type of conduct falls short of the very high threshold imposed on constructive discharge claims. *See Hipp*, 252 F.3d at 1231 ([t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment); *McCauley v. White*, 2002 WL 1022037 *6 (E.D. Pa. 2002) (granting summary judgment in favor of employer on employee's hostile work environment claim based on religion; holding "a reasonable non-denominational Christian person would not have experienced altered working conditions as a result of [the co-worker's] conduct . . . [a]lthough Plaintiff was offended by [the co-worker's] 'ridiculous' questions about plaintiff's religion and felt that [the co-worker] mocked his religious beliefs, this conduct does not amount to a hostile environment created by religious discrimination").

The facts of this case are substantially less severe than facts which have supported a finding of intolerable working conditions due to religious discrimination. *See e.g., Equal Employment Opportunity Commission v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002) (fact issues existed as to whether employee was constructively discharged based on her religion where supervisor told employee to remove items from her desk because they were too "religious in nature", supervisor called employee a "religious fanatic" and said she wanted employee "out" and "was going to make it very hard for her so she would quit", and when employee arrived at work, employee's belongings were packed and her office was being used for storage). Accordingly, this Court finds that a reasonable person in Plaintiff's position, *i.e.* a Pentecostal born again Christian, would not have felt compelled to resign due to the religious activities and messages Plaintiff was subjected to at B&A.

Favoritism/Interference with Plaintiff's Management Duties

As discussed in conjunction with Plaintiff's disparate treatment claims, Plaintiff's perceived favoritism and interference have not been shown to have been related to her membership in a protected class (not Baptist or open to "witnessing" others). For this reason alone, Plaintiff's constructive discharge claim fails. *See Platner*, 908 F.23d at 905 (favoritism toward a relative not discrimination based on gender); *Aramuru*, 112 F.3d at 1406 (animus or favoritism by supervisor that is not shown to be related to plaintiff's membership in protected class is not evidence of discrimination); *see also Laprise v. Arrow Int'l, Inc.*, 178 F.Supp.2d 597, 606 (M.D.N.C. 2001) (the "law does not allow an employee's subjective perceptions of what she thinks her employer is doing or might do govern a claim of constructive discharge") (citations omitted).

The few instances of favoritism desribed by Plaintiff would not compel a reasonable person in Plaintiff's position to resign. *See Laprise*, 178 F. Supp.2d at 606 (favoritism of management toward minority employees did not rise to the level of constructive discharge). A plaintiff "cannot rely merely on [her] subjective belief that [her] employer wrongfully failed to discipline a coworker as evidence of an adverse employment action[.]" *Id.* Moreover, in order to qualify as constructive discharge, the employer must "<u>deliberately</u> make[] an employee's working condition so intolerable that the employee is forced into involuntary resignation . . ." *See Doe*, 145 F.3d at 1450 (emphasis added).

The record is devoid of any evidence demonstrating that B&A's religious activities or favoritism were intended to force Plaintiff to resign. *See Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 797 (8th Cir. 1996) (granting summary judgment in favor of employer on employee's constructive discharge claim where employee failed to present evidence that employer intended the

suspension to force employee to resign); *Devine v. Thalhimers*, 977 F.2d 572 (4th Cir. 1990) (summary judgment in favor of employer on employee's constructive discharge claim where evidence demonstrated that employer did not intend to force employee to resign). Accordingly, Plaintiff's perceived favoritism or interference with respect to her two employees does not support a finding of constructive discharge.

<u>Failure to Promote</u>

As discussed in connection with Plaintiff's disparate treatment claims, the record evidence does not support a finding that B&A failed to promote Plaintiff to a Vice President position because she is not Baptist or because she was not open to witnessing others. Moreover, as a matter of law, B&A's failure to promote Plaintiff does not constitute an intolerable work condition. *See Wardell v. School Bd. Of Palm Beach Co.*, 786 F.2d 1554, 1557 (11th Cir. 1986) (holding mere failure to promote is not sufficient to support a finding of constructive discharge).

<u>Reassignment</u>

The re-assignment of Plaintiff to Director of Lowes Quality Initiatives did not establish an intolerable working condition. Further, Plaintiff fails to establish that she was re-assigned because she was not Baptist or open to "witnessing" others. To the contrary, Plaintiff testified that she was re-assigned only after B&A received several negative audits of the Lowes account. Although Plaintiff may have subjectively viewed her re-assignment as B&A "escorting her out the door", in light of the record evidence, a reasonable person would not have felt compelled to resign. For example, Plaintiff was not forced to perform distasteful duties or tasks she was not qualified to perform as a result of the re-assignment. *Compare, Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993) (finding constructive discharge where, among other acts, employer reassigned employee "to more

distasteful duties around the [prison] compound", such as the guard tower, AIDS unit and ward for violent inmates, even though plaintiff did not have the proper weapons certification). To the contrary, Plaintiff maintained her status as a Director and did not receive a reduction in pay. *Compare, Poole*, 129 F.3d at 551-52 (finding constructive discharge where, among other acts, employee's "responsibilities [were] reduced to virtually nothing").

Moreover, Plaintiff did not resign until after she found another job, which was <u>eight months</u> after she was not promoted to a Vice President position and <u>four months</u> after she was re-assigned as Director of Lowes Quality Initiatives. In her exit interview form, Plaintiff reported that her resignation was "voluntary - other employment". While she reported that she was "unhappy" about how the Vice President position was handled, she stated that "even if [the] position was offered, [she] wouldn't take it – happy w/Lowe's account . . . pride and ownership in progression of account." In light of this evidence, this Court finds that a reasonable person in Plaintiff's position would not have felt compelled to resign due to her re-assignment within the Lowes account. Accordingly, Defendant's motion for summary judgment on Plaintiff's constructive discharge claim is granted.

## IV.    **RETALIATION**

In order to establish a claim of retaliation, Plaintiff must demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action. *See Bass v. Board of County Comm'rs*, 256 F.3d 1095 (11th Cir. 2001).

### Plaintiff's *Prima Facie* Case

There is sufficient evidence that Plaintiff engaged in protected activity by reporting the religious activity and that Defendant was aware of Plaintiff's complaints. Although some of her

28

complaints were based on speculation, viewing the evidence in the light most favorable to Plaintiff, the record establishes that she reported what she believed to be offensive religious activities to Segreto and McCullough (human resource managers), Bunch (owner of B&A), and Blatzer (Plaintiff's supervisor). Whether Defendant's actions were actually lawful is irrelevant, as objectively a reasonable person could have believed the reported activity to be unlawful. *See Harris v. CCA*, 2005 WL 1400253 (11th Cir. 2005).

Plaintiff has also demonstrated that she suffered an adverse employment action. B&A's failure to promote Plaintiff to the Vice President of Nursing position rises to the level of an adverse employment action. *See Ramsey v. Chrysler First, Inc.*, 861 F.2d 1541, 1543 (11th Cir.1988) (recognizing failure to promote as an adverse employment action); *see also Maddin v. GTE of Florida, Inc.*, 33 F.Supp.2d 1027, 1030 (M.D.Fla.1999).

B&A's decision to reassign Plaintiff to the Director of Lowes Quality Initiatives, however, does not constitute an adverse employment action. Decisions that fall short of an ultimate employment action may qualify as an adverse employment action if the employer's decision meets "the requisite level of substantiality." *See Stavropoulos v. Firestone*, 361 F.3d 610, 617-18 (11th Cir. 2004). In essence, the employer's decision must result in some tangible, negative effect on Plaintiff's employment. *Id.* The Eleventh Circuit has cautioned that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *See Davis*, 245 F.3d at 1244 (11th Cir. 2001).

Here, Plaintiff claims that her re-assignment resulted in the loss of sixteen of her eighteen job duties. However, she fails to demonstrate that a negative change in duties resulted or that her re-

29

assignment resulted in a demotion, loss of pay or prestige. To the contrary, Plaintiff maintained her status as Director and did not suffer a reduction in pay. When a change in assignments or job duties is unaccompanied by any tangible harm, courts are reluctant to hold that the change amounts to an adverse employment action. *See Davis*, 245 F.3d at 1244-45 (citing *Mungin v. Katten Muchin & Zavis*, 116 F. 3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes"). In light of the evidence, B&A's reassignment of Plaintiff's Director position within the Lowes account, without more, does not meet the requisite level of substantiality to constitute an adverse employment. *See id.* (noting that "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities."). Accordingly, this Court will evaluate whether Plaintiff has established a causal link between B&A's decision not to promote her to a Vice President position and Plaintiff's reports of inappropriate religious activities.

"This circuit has interpreted the causal link requirement broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Davis v. Town of Lake Park, Florida*, 47 F.3d 1068, 1074 (11th Cir.1995) (citations omitted). "For purposes of a *prima facie* case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir.2000) (quoting *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir.1999)).

Viewing the evidence in the light most favorable to Plaintiff, she was denied the promotion

to Vice President of Nursing in October 2002, when Funk told her he was looking outside the company to fill the position. According to Plaintiff, she complained about the prayer calendars, anointing oils, and Goodson's witnessing in late 2000 or early 2001, nearly a year before she did not obtain the promotion. Arguably, she engaged in protected activity when she asked whether Goodson had obtained human resources' approval before issuing the Mission, Method and Values statement. Plaintiff testified that she questioned Goodson's authority in connection with the Mission, Method and Values statement approximately three or four months before she was not promoted.[16]

A lapse of nearly a year or three or four months between the protected activity and the employer's adverse employment decision is insufficient to establish the requisite causal connection. *See Higdon v. Jackson*, 393 F.3d 1211, 1220-21 (11th Cir.2004) (holding that a three-month period between the protected activity and the adverse action was insufficient to establish a causal connection in an ADA case); *see also, Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (holding that four-month time lag between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation); *Richmond v. ONEOK, Inc.*,120 F.3d 205, 209 (10th Cir.1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was, standing alone, insufficient to establish a causal connection). Plaintiff has offered no other evidence in support of a causal link between her complaints about the religious activities and the decision not to promote her. Accordingly, Plaintiff fails to establish a casual connection and in turn, fails to establish a *prima*

---

[16] Arguably, Plaintiff also engaged in protected activity in May 2003 when she complained about Bunch's comment to the nurses who worked on the Lowes account. This complaint is not relevant, however, as it occurred after Plaintiff was denied the promotion and after Blatzer was hired for the Vice President of Nursing position.

*facie* case of retaliation.

### Non-discriminatory Reason & Evidence of Pretext

Even assuming Plaintiff could prove a *prima facie* case of retaliation, she fails to rebut Defendant's non-discriminatory reasons for not promoting her. It is undisputed that several months before Funk's announcement that some Directors would be promoted to Vice President positions, a second audit of the Lowe's account resulted in a poor review of Plaintiff's department. Funk testified that he did not believe Plaintiff was qualified for a Vice President position because she lacked the national industry experience and lacked the leadership skills necessary to fulfill a Vice President position. Funk ultimately hired an individual from outside B&A who had more national experience than Plaintiff.

While Plaintiff testified that she subjectively believed she was more qualified than Blatzer for the position, she conceded that she never had the opportunity to review Blatzer's qualifications. In fact, Blatzer had thirty-four years of nursing experience. She spent twelve of those years supervising at a national company, where she held positions at the Director and Regional Manager level. While Plaintiff had a masters degree and held certifications which Blatzer did not, she fails to demonstrate that her educational achievements were a prerequisite to obtaining a Vice President position or made her more qualified than Blatzer. More importantly, Plaintiff fails to demonstrate a sufficient disparity between their qualifications which would support an inference that Funk could not have believed Blatzer to be more qualified. *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir. 2001) (the relevant inquiry "*is not to judge which employee was more qualified, but to determine whether any disparity between* [plaintiff's] and [the other's] *managerial qualifications is*

32

so great that a reasonable fact-finder could infer that [the company] did not believe [the others] to be better qualified"). Plaintiff therefore fails to rebut Defendant's legitimate non-discriminatory reasons for failing to promote Plaintiff. Summary judgment in Defendant's favor on Plaintiff' retaliation claim is therefore granted.[17]   Accordingly it is

**ORDERED AND ADJUDGED** that:

1.   Defendant's motion for summary judgment (Dkt. 29) is GRANTED. Plaintiff's claim for disparate treatment, constructive discharge and retaliation are DISMISSED.

2.   The Clerk is directed enter to Judgment in favor of Defendant on all counts and close this case.

**DONE AND ORDERED** in chambers this 2nd day of February, 2006.

*Whittemore*

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

---

[17] Without any argument or citation to the record, Plaintiff concludes that all of the religious based behavior at B&A comprise "key proof of her claims under both the *McDonnell/Douglas* and mixed motive paradigms." (Dkt. 21, p. 2-3). Notwithstanding that Plaintiff has not alleged a mixed motive claim in her complaint, she fails to submit evidence in support of such a claim.

To establish a mixed motive claim, a plaintiff must show, either by direct or circumstantial evidence, that unlawful discrimination was a motivating factor in the adverse employment action. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). As Defendant has articulated legitimate, non-discriminatory reasons for its decision not to promote Plaintiff to the Vice President of Nursing position, Plaintiff must offer sufficient evidence to create a genuine issue of material fact that Defendant's legitimate reasons for not promoting her were only some of the reasons and that another "motivating factor" was the fact that she is not Baptist and not open to "witnessing" others.

Plaintiff has not refuted Funk's testimony regarding his reasons for not promoting her. Plaintiff testified that she never discussed religion with Funk. She fails to offer any evidence, circumstantial or otherwise, to suggest that Funk was Baptist, open to witnessing others, or discriminated against employees who were not Baptist. Other than her allegations that she was not promoted because she was not open to witnessing others, Plaintiff has not offered any evidence that her religion played a role in Funk's decision not to promote her. Accordingly, Plaintiff could not establish a mixed motive discrimination claim, even if one were plead.